UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-60669-CIV-ALTMAN

TYSHON M. RENFORD,

    *Petitioner,*

*v.*

RICKY D. DIXON, SECRETARY,
DEPARTMENT OF CORRECTIONS,

    *Respondent.*[1]

_____/

## ORDER

The Petitioner, Tyshon Renford, filed this *pro se* Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging his state-court conviction and sentence for the crimes of armed kidnapping, robbery with a firearm, and armed carjacking. *See* Petition [ECF No. 1]. For the following reasons, we **DISMISS** Ground Three of the Petition as procedurally barred and **DENY** Grounds One and Two on the merits.

## THE FACTS

The State of Florida charged Renford and a codefendant by Information with four counts: armed kidnapping (Count 1); robbery with a firearm (Count 2); armed carjacking (Count 3); and aggravated battery with a deadly weapon (Count 4). *See* Information [ECF No. 9-1] at 9–11. During Renford's first trial, the judge granted the defense's motion for a mistrial, *see* Order Granting Mistrial [ECF No. 9-1] at 25, because the Assistant State Attorney mentioned that the codefendant had pled

---

[1] The original Respondent in this case, Mark S. Inch, retired from his position as Secretary of the Florida Department of Corrections on November 19, 2021. As a result, former Secretary Inch's successor, Ricky D. Dixon, has been automatically substituted as the Respondent. *See* FED. R. CIV. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

guilty to the same charges, *see* First Trial Transcript [ECF No. 10-1] at 14–20 ("You will learn that the other man that Mr. Ali was robbed by . . . has already been convicted of this case [sic], and is serving a sentence in Florida state prison."); *id.* at 89–100 (granting the motion for a mistrial because of "the State's remarks . . . that the co-defendant was convicted and is serving a prison sentence"). The court called in a new venire for jury selection the next day—but the parties were unable to select a jury. *See* Second Jury Selection Transcript [ECF No. 10-2] at 153–56.

The judge didn't empanel a third venire for the retrial until several months later. Before that second trial, the State filed a motion to admit the testimony from the first trial of Mehboob Ali, the victim. *See* State's Motion to Admit Former Testimony [ECF No. 9-1] at 35–38. In support, the State explained that the victim, who was from Bangladesh, had "returned to his native country to assist his family with matters related to the death [of] the Victim's mother." *Id.* at 36. The State argued that, since defense counsel had demanded a speedy trial—and given that the victim would not "return[] to [the trial court's] jurisdiction prior to the expiration of speedy trial"—the court should find the victim "unavailable" to testify. *Id.* at 37. After a lengthy hearing, the judge determined that the victim was indeed unavailable, granted the State's motion, and admitted the victim's testimony from the first trial. *See generally* Hearing Transcript on Unavailability of Witness ("Unavailability Hearing") [ECF No. 10-6] at 1–97.

At his second trial, a jury found Renford guilty of Counts 1, 2, and 3—and not guilty on Count 4. *See* Verdict [ECF No. 9-1] at 40–43. The trial court then sentenced Renford to three mandatory (and concurrent) terms of life in prison. *See* Judgment and Sentence [ECF No. 9-1] at 45–46, 48–56. Renford timely appealed. *See* Notice of Appeal for Direct Appeal [ECF No. 9-1] at 58.

While his case was on appeal, Renford went back to the trial court and filed a motion to correct an illegal sentence under Florida Rule of Criminal Procedure 3.800(b). In that motion, Renford contended that the trial court had erred by imposing mandatory life sentences on each of the three

counts and insisted that Renford "may not be required to serve more than 15 years in prison before being eligible for release." Motion to Correct Illegal Sentence [ECF No. 9-1] at 60–64. The trial court agreed, granted Renford's motion, and (again) imposed concurrent life sentences on each of the three counts—this time noting (correctly) that the mandatory portion of those sentences was 15 years, not life. *See* Order and Amended Sentence [ECF No. 9-1] at 91–97.

On February 14, 2019, the Florida Fourth District Court of Appeal ("Fourth DCA") affirmed the corrected judgment and sentence. *See Renford v. State*, 264 So. 3d 164, 164 (Fla. 4th DCA 2019). The Fourth DCA issued its mandate on March 15, 2019. *See* Direct Appeal Mandate [ECF No. 9-1] at 196.

Almost one year later, on February 10, 2020, Renford filed his motion for postconviction relief in the trial court under Florida Rule of Criminal Procedure 3.850. *See* Postconviction Motion [ECF No. 9-1] at 198–213. In that motion, Renford asserted two claims. *See generally id.* In its response, the State urged the trial court to deny both claims. *See* State Postconviction Response [ECF No. 9-1] at 221–36. On April 1, 2020, the trial court "adopt[ed] and incorporate[d] the legal and factual reasoning in the State's Response" and denied the Postconviction Motion. *See* Order Denying Postconviction Motion [ECF No. 9-3] at 109–10. Renford never appealed the denial of his Postconviction Motion.

On March 23, 2020, a few days *before* the postconviction court entered its order, Renford filed *this* Petition.[2] *See* Petition at 24. And the Respondent filed its Response to the Order to Show Cause. *See* Response [ECF No. 8]. On October 5, 2021, Renford filed a "Motion for Abeyance," asking us not to rule on his Petition so that he could "file his 'Successive Motion for Post-Conviction Relief Under the Manifest Injustice Exception" in state court. Motion for Abeyance [ECF No. 18] at 1

---

[2] "Under the 'prison mailbox rule,' a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009). "Absent evidence to the contrary, [courts] assume that a prisoner delivered a filing to prison authorities on the date that he signed it." *Jeffries v. United States*, 748 F.3d 1310, 1314 (11th Cir. 2014).

(cleaned up). We denied the Motion for Abeyance in a paperless order, reasoning that Renford "hasn't come close to meeting his burden of showing that the claims he seeks to pursue in state court—whether it's for exhaustion purposes or not—have any merit." Paperless Order [ECF No. 19] (citing *Rhines v. Weber*, 544 U.S. 269, 277 (2005)).

## THE LAW

### I.     The Antiterrorism and Effective Death Penalty Act ("AEDPA")

AEDPA instructs district courts to deny any claim that was "adjudicated on the merits" in a state-court proceeding unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (summarizing 28 U.S.C. § 2254(d)–(e)). To have "adjudicated [the claim] on the merits," the state court need not have issued any kind of formal opinion or even outlined its reasoning. *Id.* at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Rather, when a state court doesn't articulate its reasons for the denial, the federal court must "'look through' the unexplained decision to the last related state-court decision that does provide a rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). "Clearly established Federal law" means "the holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To be "contrary to clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a

different result from the Supreme Court when faced with materially indistinguishable facts." *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010) (cleaned up).

For "a state court's application of [Supreme Court] precedent" to be "'unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (cleaned up). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Richter*, 562 U.S. at 101. "And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (cleaned up).

Section 2254(d) similarly prohibits federal judges from reevaluating a state court's factual findings unless those findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To establish that a state court's factual findings were unreasonable, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (quoting 28 U.S.C. § 2254(e)(1)).

"AEDPA's standard is intentionally difficult to meet." *Woods*, 575 U.S. at 315 (cleaned up). When reviewing state criminal convictions on collateral review, "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as a guard against extreme malfunctions in

the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 316 (cleaned up).

Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). The *Brecht* harmless-error standard requires habeas petitioners to prove that they suffered "actual prejudice." *Mansfield v. Sec'y, Dep't of Corr.*, 679 F.3d 1301, 1307 (11th Cir. 2012). As the Supreme Court recently explained, while the passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht*'s actual-prejudice requirement. *Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022). In other words, a habeas petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 1526 ("[O]ur equitable precedents remain applicable 'whether or not' AEDPA applies." (citing *Fry v. Pliler*, 551 U.S. 112, 121 (2007)). In short, a "federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petition has cleared both tests." *Id.* at 1524 (emphasis in original); *see also Mansfield*, 679 F.3d at 1307 ("[A] habeas petition cannot be successful unless it satisfies both [AEDPA] and *Brecht*.").

## II.    AEDPA's Procedural Requirements

"[A] person in custody pursuant to the judgment of a State court" has one year to file a habeas petition in federal court. 28 U.S.C. § 2244(d)(1). That one-year period "runs from the latest of" the following dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly

recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)–(D). But this limitations defense is waivable. *See Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 655 (11th Cir. 2020) (explaining that the State may express its intent to "waive the limitations bar"). Here, the Respondent concedes that the Petition is timely. *See* Response at 5 ("Thus, the instant petition is timely."). We'll accept that waiver and, as a result, treat the Petition as timely. *See generally Day v. McDonough*, 547 U.S. 198, 209–10 (2006) ("[A] district court is not required to doublecheck the State's math [for timeliness purposes].").

Beyond meeting this one-year window, though, federal habeas petitioners must also *exhaust* their claims by "*properly* present[ing] [them] to the state courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (emphasis in original). Specifically, federal habeas petitioners must "fairly present every issue raised in [their] federal petition to the state's highest court, either on direct appeal or on collateral review." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (cleaned up). "If a petitioner fail[ed] to 'properly' present his claim to the state court—by exhausting his claim[ ] and complying with the applicable state procedure—prior to bringing his federal habeas claim, then [§ 2254] typically bars [courts] from reviewing the claim." *Id.* In other words, where a petitioner has not "*properly* presented his claims to the state courts," the petitioner will have "procedurally defaulted his claims" in federal court. *O'Sullivan*, 526 U.S. at 848.

All that said, "[s]tates can waive procedural bar defenses in federal habeas proceedings, including exhaustion." *Vazquez v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 964, 966 (11th Cir. 2016) (cleaned up). But "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, *expressly* waives the requirement." 28 U.S.C. § 2254(b)(3) (emphasis added); *see also McNair v. Campbell*, 416 F.3d 1291, 1304 (11th Cir. 2005) (same).

ANALYSIS

### A.      The Unexhausted Claim: Ground Three

We start with the easy one: Ground Three is unexhausted.[3]

In Ground Three, Renford claims that the trial court violated the Double Jeopardy Clause by failing to dismiss the charges against him after the mistrial. *See* Petition at 15 ("Violation of the Double Jeopardy Clause . . . . I was placed in another trial for the same offense [even though the State intentionally provoked a mistrial.]"). The State (in Renford's telling) "intentionally provoked" a mistrial by mentioning the codefendant's guilt during opening statements. *See id.* at 15–18. For good measure, Renford attaches to Ground Three a separate subclaim—that Florida law required the same judge who presided over the mistrial to adjudicate his motion to dismiss. *Id.* at 15. In other words, he seems to be saying that it was error for a "different judge" to rule on his motion. *Id.*[4]

Renford concedes, however, that he failed to advance Ground Three either in his direct appeal or in his state post-conviction motion. *See id.* at 14 ("Petitioner did not raise this issue in his direct appeal . . . . The Petitioner did not raise this issue through a post-conviction motion."). And our review of the record confirms this. Contra Renford's contentions here, his lawyer *did* move to dismiss the charges on double-jeopardy grounds—arguing that the prosecutor's comment "was intended to

---

[3] The State concedes that Renford properly exhausted Grounds One and Two. *See* Response at 6–7. And we'll accept that concession as an express waiver of the exhaustion defense as to those two claims. *Cf.* 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.").

[4] As one might expect, this subclaim, too, is unexhausted. Indeed, so far as we can tell, Renford has never made this argument before. *See Ward*, 592 F.3d at 1156 ("Thus, in order to exhaust state remedies, a petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review."). Even if we were to reach the merits of this subclaim, though, we'd have little trouble denying it, because Florida law gives all circuit judges within a circuit concurrent jurisdiction over matters pending before that circuit. *See In Interest of Peterson*, 364 So. 2d 98, 99 (Fla. 4th DCA 1978). And Renford has pointed us to no Florida law—nor have we found any—for his only-the-same-judge-could've-ruled-on-my-motion theory.

provoke the defendant into moving for a mistrial." Motion to Dismiss on Double Jeopardy Grounds [ECF No. 9-1] at 22–23 (quoting *Oregon v. Kennedy*, 456 U.S. 667, 679 (1982)). The trial court denied that motion, *see* Order Denying Motion to Dismiss [ECF No. 9-1] at 33, and Renford elected (for his own reasons) not to press this claim further. He thus never gave "the state courts a full and fair opportunity to resolve [this] federal constitutional claim[] before th[at] claim[] [was] presented to the federal courts." *O'Sullivan*, 526 U.S. at 845.

Remember that, to fairly present a claim, "a state prisoner must exhaust state court remedies, either on direct appeal or in a state post-conviction motion." *Cortes v. Gladish*, 216 F. App'x 897, 899 (11th Cir. 2007). "A failure to exhaust occurs, in turn, when a petitioner has not fairly presented every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1284 (11th Cir. 2012) (cleaned up). Ground Three, in short, is unexhausted and procedurally defaulted.

There are, to be sure, two exceptions to the general rule that a federal court may not consider a procedurally defaulted claim on the merits: "cause and prejudice" and "actual innocence." *See Dretke v. Haley*, 541 U.S. 386, 393 (2004) ("[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default. We have recognized a narrow exception to the general rule when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense."); *see also Tharpe v. Warden*, 898 F.3d 1342, 1346 (11th Cir. 2018) ("A federal court cannot review a procedurally defaulted claim unless the petitioner can show cause for the failure to properly present the claim and actual prejudice." (citing *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977))). Neither exception helps Renford here.

"Cause for a procedural default exists where something external to the petitioner, something that cannot fairly be attributed to him, . . . impeded his efforts to comply with the State's procedural

rule." *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (cleaned up). "To establish prejudice, a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different." *Harris v. Comm'r, Ala. Dep't of Corr.*, 874 F.3d 682, 688 (11th Cir. 2017) (cleaned up). "[A]llegations [supporting cause and prejudice] must be factual and specific, not conclusory." *Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011).

Trying to show cause for his failure to exhaust, Renford says that his "claim was not cognizable on a direct appeal" and wasn't properly preserved. *See* Petition at 14. He falters at both steps. For starters, trial counsel *did* preserve Renford's double-jeopardy claim by filing a motion to dismiss on that ground in the trial court. *See* Motion to Dismiss on Double Jeopardy Grounds [ECF No. 9-1] at 22–23. In any case, Florida law is clear that Renford could have raised his double-jeopardy claim for the first time on direct appeal. *See Weitz v. State*, 229 So. 3d 872, 874 (Fla. 2d DCA 2017) ("[A] double jeopardy violation constitutes fundamental error that may be raised for the first time on appeal"). And, even if he'd failed to do that, Renford *still* could have asserted his double-jeopardy contentions in a postconviction motion under FLA. R. CRIM. P. 3850. *See Kerrin v. State*, 8 So. 3d 395, 396 (Fla. 1st DCA 2009) ("[D]ouble jeopardy claims are cognizable in rule 3.850 motions."); *Smith v. State*, 741 So. 2d 576, 577 (Fla. 1st DCA 1999) ("[A] violation of the prohibition against double jeopardy is a fundamental error, which can be presented for the first time in a postconviction motion." (cleaned up)). Renford (it's true) may not have known all of this, but "ignorance of available post-conviction remedies cannot excuse a procedural default." *Tower v. Phillips*, 7 F.3d 206, 211 (11th Cir. 1993). Renford has thus failed to show some "external cause" for his failure to exhaust.

Of course, without cause, we needn't address prejudice. *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982) ("Since we conclude that these respondents lacked cause for their default, we do not consider whether they also suffered actual prejudice."); *Palmes v. Wainwright*, 725 F.2d 1511, 1525–26 (11th Cir. 1984) ("Because appellant has made no showing of cause we hold that this issue too is

barred. We do not examine the prejudice, if any, that resulted from the failure to raise these issues because the *Sykes* standard for relief from its rule is in the conjunctive. Having failed to show 'cause,' appellant necessarily fails the conjunctive.").

The actual-innocence doctrine is likewise inapplicable. "[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). This exception, however, "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted the petitioner.'" *Id.* at 395 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). Renford doesn't argue that he's actually innocent of the charges against him. *See generally* Petition. Nor does he point to any "new evidence" that might support a contention that he is. *See generally id.* That's pretty much the end of that. *See Brown v. Dixon*, 2022 WL 1197657, at *9 (S.D. Fla. Mar. 15, 2022) ("Brown fails to argue that he's actually innocent. Nor does he point to any 'new evidence' that might support a contention that he is. This exception is thus likewise inapplicable here." (cleaned up)).

When a petition "contains both exhausted and nonexhausted claims, it is a classic 'mixed petition.'" *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1351 (11th Cir. 2004). When a petitioner presents a "mixed petition" on habeas review, "the district court ordinarily must either dismiss the petition, or grant a stay and abeyance to allow the petitioner to exhaust the unexhausted claim[s]." *Ogle v. Johnson*, 488 F.3d 1364, 1370 (11th Cir. 2007) (cleaned up). But the district court needn't dismiss or stay the case "when the claims raised for the first time at the federal level can no longer be litigated on the merits in state court because they are procedurally barred." *Kelley*, 377 F.3d at 1351. Simply put, we may deny the unexhausted claims in a mixed petition when "it would serve no purpose to dismiss the petition for further exhaustion because review of those claims is unavailable in state courts." *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998).

11

And that's precisely what we have here because (for two reasons) Renford can no longer exhaust Ground Three in state court. *First*, a state prisoner cannot, under FLA. R. CRIM. P. 3.850, file a motion for postconviction relief more than two years after his sentence has become final. *See* FLA. R. CRIM. P. 3.850(b) ("No other motion shall be filed or considered pursuant to the rule if filed more than 2 years after the judgment and sentence become final[.]"); *see also Rosado v. State*, 654 So. 2d 623, 624 (Fla. 5th DCA 1995) ("The law in Florida is that a 3.850 motion filed within two years of the issuance of a mandate is timely filed."). Renford's sentence became final when the Fourth DCA issued its mandate on March 15, 2019. *See Beaty v. State*, 701 So. 2d 856, 857 (Fla. 1997) ("[T]he two-year period for filing a motion for postconviction relief began to run upon issuance of [the district court of appeal's] mandate."); Direct Appeal Mandate [ECF No. 9-1] at 196 (issuing on March 15, 2019). In other words, Renford had until March 15, 2021, to file any postconviction motions under FLA. R. CRIM. P. 3.850. Since Renford didn't seek a stay of these proceedings (for the purpose of exhausting Ground Three) until October 5, 2021, *see* Motion for Abeyance [ECF No. 18], he missed that deadline by about six months.

*Second*—and in any event—Renford wouldn't be allowed to file a successive motion under FLA. R. CRIM. P. 3.850(h) because he hasn't shown "good cause" for failing to raise this issue in his Postconviction Motion. *See* FLA. R. CRIM. P. 3.850(h)(2) ("A second or successive motion is an extraordinary pleading. . . . [A court may dismiss a second or successive motion if] the judge finds . . . there was no good cause for the failure of the defendant or defendant's counsel to have asserted those grounds in a prior motion."); *Witt v. State*, 465 So. 2d 510, 512 (Fla. 1985) ("A second petition for post-conviction relief under rule 3.850 may be dismissed as an abuse of procedure unless the petitioner shows justification for the failure to raise the issues in the first petition."); *see also Ruff v. Florida*, 762 F. App'x 959, 961 (11th Cir. 2019) ("[W]e need not reach the merits of this issue. Ruff's double-jeopardy

claim was barred on state procedural grounds as untimely and improperly successive, and he has not argued that an exception . . . applies to the application of the state procedural bar.").

There are (it's true) three Florida-law exceptions to this default bar. These exceptions apply when a state habeas petitioner can show that (1) "the facts on which the claim is predicated were unknown to the movant," (2) a "fundamental constitutional right asserted was not established within the period provided for herein and has been held to apply retroactively," or (3) "retained . . . counsel, through neglect, failed to file the motion." FLA. R. CRIM. P. 3.850(b)(1)–(3). But Renford never even tries to suggest that any of these three exceptions saves Ground Three here. That's reason enough to stop here. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances.").

Instead, Renford asks us to ignore all of this because (he says) he qualifies for Florida's "manifest injustice" exception. *See* Petition at 15. But Florida's courts have repeatedly held that there is no such "manifest injustice" exception "to [FLA. R. CRIM. P. 3.850's] time limitation or bar against filing successive postconviction motions." *Cuffy v. State*, 190 So. 3d 86, 87 (Fla. 4th DCA 2015); *see also State v. Stephenson*, 321 So. 3d 835, 838–39 (Fla. 4th DCA 2021) (collecting cases). Since Renford isn't entitled to a stay, we denied his Motion for Abeyance [ECF No. 18] in a Paperless Order [ECF No. 19]; *cf. Kelley*, 377 F.3d at 1351 ("[W]hen it is obvious that the unexhausted claims would be procedurally barred in state court due to a state-law procedural default, we can forego the needless judicial ping-pong and just treat those claims now barred by state law as no basis for federal habeas relief." (cleaned up)). And, since Ground Three is unexhausted, it's **DISMISSED** as procedurally defaulted.

### B.     The Exhausted Claims

We turn, then, to the two claims the Respondent concedes have been exhausted—Grounds One and Two, which we address in turn.

#### a.   Ground One

In Ground One, Renford castigates the trial court for introducing, during his second trial, the testimony of the victim from the first trial because (he says) "no due diligence was shown to secure the victim for trial." Petition at 4. Renford adds that the state court violated his rights under the Confrontation Clause by eliminating his "right to face an accuser." *Id.* (arguing that his "trial strategy would not be the same if [the] victim was present to be re-cross-examined"). In the Respondent's view, "the State demonstrated that a good faith effort had been made to secure the victim's appearance, such that the victim was properly considered unavailable for trial . . . . As such, the state court's determination as to this issue was neither contrary to, nor an unreasonable application of[,] clearly established federal law." Response at 20–21.

Renford presented the substance of Ground One on direct appeal to the Fourth DCA, *see* Initial Brief [ECF No. 9-1] at 143–49 ("[T]he trial court erred in permitting the State to use [the victim's prior testimony when he failed to appear for [the Petitioner's] trial."), which summarily affirmed the trial court's decision, *see Renford*, 264 So. 3d at 164.[5] Since the trial court held a lengthy evidentiary hearing on this issue (more on this below)—and then denied this claim on the merits—we presume that the Fourth DCA adopted the trial court's findings. *See Wilson*, 138 S. Ct. at 1192 ("We hold that the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained

---

[5] Renford didn't have to re-raise this claim in his Postconviction Motion because "[a] claim of trial court error generally can be raised on direct appeal . . . [,] not in a rule 3.850 motion." *Bruno v. State*, 807 So. 2d 55, 63 (Fla. 2001).

decision adopted the same reasoning."). In other words, given that this claim was "adjudicated on the merits in State court proceedings," we apply the heightened standard of review outlined in § 2254(d). *See* 28 U.S.C. § 2254(d) (prohibiting a federal court from second-guessing a state court's adjudication on the merits unless it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding"); *see also DeJesus v. Sec'y, Fla. Dep't of Corr.*, 2022 WL 1262093, at *11 (S.D. Fla. Apr. 28, 2022) (Altman, J.) ("Since the substance of [the claim] was adjudicated on the merits in State court proceedings, we must apply the heightened standard of review set out in § 2254(d)." (cleaned up)).

Under the Sixth Amendment's Confrontation Clause, a criminal defendant has the right "to be confronted with the witnesses against him[.]" U.S. CONST. AMEND. VI. This right generally requires that witnesses in a criminal case "appear in person and give live testimony at trial." *United States v. Smith*, 928 F.3d 1215, 1226 (11th Cir. 2019). In *Crawford v. Washington*, the Supreme Court explained that this "live testimony" requirement can be excused *only* where two conditions are met: (1) the witness is "unavailable to testify" at trial; and (2) "the defendant has had a prior opportunity to cross-examine [the declarant]." 541 U.S. 36, 59 (2004).

Starting with the second element, during the first trial, defense counsel had the opportunity to cross-examine the victim and, in fact, took full advantage of that opportunity. *See, e.g.*, First Trial Transcript [ECF No. 10-1] at 79 ("Q: I'm going to ask you again because you testified here today that—I think you said on direct examination that both people were tying you up. A: That's what it felt there were more than one person doing things [sic]. Q: And you say it felt because you cannot see? A: Because I couldn't see. That's correct."); *id.* at 83 ("Q: Do you remember who threw you to the floor? A: No, I don't. Q: Do you remember which one of these two people went into your pockets and took money or anything out of your pockets? A: No, I don't. Q: That's because it was dark? A: Yes, sir.").

The victim also sat for at least *two* depositions, during which defense counsel had the opportunity to cross-examine him *under oath. See id.* at 66 ("Q: After that at some point you have what we call a deposition, right? A: Yes, sir. . . . Q: And then more recently we did another deposition where I was actually involved for the first time, and I asked you again some questions about what happened in reference to this case; right? A: Yes, sir."). Renford's lawyer, in short, had *three* full and fair opportunities to cross-examine the victim *under oath* before the second trial began. That's sufficient to satisfy the second *Crawford* element. *See United States v. Osmakac*, 868 F.3d 937, 956 (11th Cir. 2017) ("The Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose the infirmities of a witness through cross-examination." (cleaned up)). [6]

The viability of Renford's claim thus turns on the propriety of the trial court's finding that the victim was "unavailable" at the second trial. A witness is unavailable if, despite "a good-faith effort to obtain [the witness's] presence at trial," the prosecution has been unable to secure the witness's appearance. *Barber v. Page*, 390 U.S. 719, 724–25 (1968); *accord Hardy v. Cross*, 565 U.S. 65, 69–70 (2011). Of course, "the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." *Cross*, 565 U.S. at 71–72. To the contrary, the Eleventh Circuit "does not require the government to make every conceivable effort to locate the witness; it requires

---

[6] During the hearing the trial court held on Renford's motion to dismiss, Renford's lawyer argued that his cross-examination would have been "considerably different" during the second trial had the witness been physically present. Unavailability Hearing at 52–54. But the Confrontation Clause doesn't guarantee a defendant the right to cross-examine a witness in a particular way—or on multiple occasions. *See Osmakac*, 868 F.3d at 956 ("The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (cleaned up)). In any event, Renford never presses this argument here, *see generally* Petition—and we generally don't consider arguments the parties elected, for whatever reason, not to raise in federal court, *see Campbell*, 26 F.4th at 873 ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances.").

only a good-faith effort that is reasonable under all of the circumstances of the case." *Smith*, 928 F.3d at 1230.

As we've said, the trial court held an evidentiary hearing on this issue. *See generally* Unavailability Hearing. At that hearing, the State called three witnesses—an investigator, an information-technology ("IT") specialist, and the lead prosecutor. *See generally id.* All of these witnesses told the court about the steps they had taken to secure the victim's attendance at the third trial. To place the court's decision in its proper context, we'll review each of these witnesses' testimony in some detail now.

The prosecutor—who testified last—said that she "always had contact with Mr. Ali [the victim] since the [first] trial, which I believe ended in April," and that she knew the victim was leaving for Bangladesh on April 23, 2017. *Id.* at 27. The prosecutor testified that the victim had "always left it open-ended" as to when he would return from Bangladesh. *Id.* at 29. Although the prosecutor was still in contact with the victim when he first arrived in Bangladesh, at some point, "it became difficult" for the prosecutor to call the victim—mainly because her calls would go straight to the victim's (full) voicemail-box. *Id.* at 28. From this, the prosecutor deduced that she "was not going to be able to get [the victim] back voluntarily," and that she would need to tap into the State's other resources. *Id.* at 28–29. Noting the "ticking" of the speedy-trial clock—and given that she'd called the victim's cellphone "no less than thirty times"—the prosecutor concluded that the victim was unavailable. *Id.* at 29–30. The prosecutor (it's true) eventually "reach[ed] [the victim] through [WhatsApp]"—but these conversations only confirmed the victim's unavailability. *Id.* at 30. Indeed, according to the prosecutor, the victim relayed that he planned to stay in Bangladesh *indefinitely* "due to religious reasons" surrounding his mother's death. *Id.* at 35.

The investigator testified that the prosecutor asked him to contact the victim on June 14, 2017. *Id.* at 8. But, when the investigator tried to call and text the victim on his cellphone—the same phone the investigator had used to connect with the victim in the past—the victim didn't answer. *Id.* The

investigator followed up by visiting the victim's last known home address—but he found no one there. *Id.* at 8–9. Not content to let things lie, the investigator spoke to a neighbor who told him that "Mr. Ali had left the country sometime earlier this year . . . and [that Ali] hadn't been seen for quite a while." *Id.* at 10. Before leaving the house, the investigator "left a business card on the door of the residence, and requested that anyone who responded back to the residence call me." *Id.* Later that night, the victim's wife called the investigator and told him that "her husband was still in Bangladesh." *Id.* at 11. "He had not returned back," the wife explained. *Id.* "And because of the situation, which I believe is a death in the family, they didn't have an expected time to come back." *Id.* The victim's wife also said that the victim's cellphone was no longer working and explained that he could only be contacted via "WhatsApp." *Id.* at 17, 30. The investigator then confirmed with U.S. Customs and Border Patrol that the victim hadn't returned since he left for Bangladesh in April 2017. *Id.* at 11–12.

The IT specialist testified that, once the prosecutor spoke to the victim by WhatsApp, he tried to teach the victim to use "Citrix" *both* to communicate with the State *and* (potentially) to testify at trial. *Id.* at 20–21. According to the IT specialist, "we [had] some technical difficulties because [the victim] wasn't able to receive the email or he wasn't able to view the email and make the connection that we need." *Id.* at 21–22. The IT specialist then tried to connect with the victim via "Skype," but this method failed, too, because neither the victim nor the IT specialist could ascertain the victim's "Skype ID." *Id.* at 22–23. In any event, for two reasons, WhatsApp wasn't a viable alternative. *One*, WhatsApp "is not encrypted, it's not secure, and requires [a] Wi-Fi connection." *Id.* at 24. *Two*, with WhatsApp, "if you have a weak connection[,] you have problems with [a] video or audio call[.]" *Id.* And the IT specialist found it "difficult to establish" a strong connection with the victim's network. *Id.* at 25.

After hearing this evidence, the trial court granted the State's motion to admit the victim's prior testimony, reasoning that, "[i]n light of the testimony presented by the State, [the court] find[s]

that they were diligent in trying to return the victim back to Florida for purposes of the trial." *Id.* at 81. The trial court also explained that, "in terms of the *Crawford* issue, the facing his accuser, the transcript of the prior trial, which gave the defendant a right to confront the witness, combined with what the Court finds is a legitimate reason why the witness is not here, and a legitimate good faith effort by the State. I do find that under the rules the transcript is admissible. Or I should say the prior testimony is admissible." *Id.* at 84.

For five reasons, we think that this was a reasonable application of the law. *First*, when the prosecutor had trouble contacting the victim, she sent an investigator to the victim's house. That investigator *both* spoke to a neighbor *and* left a card at the door. When the victim's wife called the investigator at the number on that card, the investigator learned that the victim had traveled to Bangladesh and wasn't certain to return in time for trial. *Second*, the investigator didn't just take the wife at her word. Instead, he confirmed with the U.S. Customs and Border Patrol that the victim had, in fact, left the country for Bangladesh—and that he had not yet returned. *Third*, both the prosecutor and the investigator tried to call and text the victim—on the same phone they had used for him before—dozens of times. *Fourth*, when the victim's wife gave the investigator the victim's WhatsApp information, the prosecutor quickly contacted the victim at that number and tried to determine when the victim would be back. *Fifth*, when it became clear from these WhatsApp conversations that, because of family obligations, the victim wouldn't be back in time for the second trial, the prosecutor engaged the services of the IT specialist, who tried to teach the victim how to testify remotely from Bangladesh. Unfortunately, this all being before the pandemic, the investigator was unable to establish the necessary link with the victim—possibly because the victim's Internet connection in Bangladesh was unstable. None of this evinces bad faith on the part of the State. To the contrary, at every turn, the State did everything it could have done—read: "good-faith efforts"—to secure the victim's testimony at trial. That's plainly enough in these circumstances. *Cf. Smith*, 928 F.3d at 1229–30 (finding

that the state acted reasonably when it tried, several times, to contact a missing witness through her attorney and her boyfriend); *United States v. Siddiqui*, 235 F.3d 1318, 1324 (11th Cir. 2000) (finding the government's efforts reasonable when it offered to pay the witness's travel expenses); *Hamilton v. Morgan*, 474 F.3d 854, 860–62 (6th Cir. 2007) (finding reasonable the state court's conclusion that the witness "was unavailable because his commanding officer asserted that he would return to Germany after his tour of duty in Kosovo, and because Germany was beyond the subpoena power of the [state courts]"); *United States v. Eufracio-Torres*, 890 F.2d 266, 270 (10th Cir. 1989) ("The law does not require the government to utilize an absolute means of attempting to assure the appearance of a witness, only a reasonable means . . . . The fact that the means utilized were unsuccessful does not mean that the government's efforts were not made in good faith.").

The Eleventh Circuit's decision in *Siddiqui* is on all-fours with our case. There, a witness living in a foreign country refused to come back for trial—even though the government "faxed a letter to [the witness] explaining that the case against Siddiqui would be much stronger if [the victim] could attend the trial, and that it would pay [the victim's] expenses to attend the trial." *Id.* at 1324. As the Eleventh Circuit explained, the victim "sent a fax to the government confirming that he would not be able to testify at the trial[,]" even after the government promised to cover his expenses and impressed upon him the importance of his testimony. *Id.* The court held that the government engaged in a "good faith effort[] to obtain [the witness's] presence at trial," and that it had shown "that [the witness] was unavailable to testify." *Id.*

So too here. Like the witness in *Siddiqui*, our victim was clear that he had no plans of returning to the United States—principally because he had to attend to some religious obligations stemming from the death of his mother. *See* Unavailability Hearing at 35 ("As part of his religion there are certain things that have to be observed with respect to a death in the family . . . And so he had to return [to Bangladesh]. And also because he is the, I guess, first male, or the first available male, he had to settle

those things."). And, like the government in *Siddiqui*, the State did all it could to secure the victim's testimony—all to no avail. *See id.* at 81 ("In light of the testimony presented by the State, I do find that they were diligent in trying to return the victim back to Florida for purposes of the trial.").

While Renford now says that the State could've done more to secure the victim's presence at trial, "the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken." *Cross*, 565 U.S. at 72. Ground One, in sum, is **DENIED**.

C.    **Ground Two**

In Ground Two, Renford alleges that the prosecutor violated his due-process rights when, "a day before the trial was to be commenced," she, under the guise of preparing the victim for trial, showed the victim a photo lineup the court had already suppressed—even though the prosecutor "knew the court's ruling of the photo lineup as inadmissible." Petition at 13. Conceding that the lineup had been suppressed, the Respondent maintains that it was proper for the prosecutor to prepare the witness with that lineup because the lineup was excluded, not as a result of its suggestiveness, but only "as fruit of the poisonous tree stemming from an improper arrest." Response at 21.

To understand what the parties are getting at here, we need a bit of color. Before the first trial, defense counsel moved to suppress a photo lineup that had been shown to the victim shortly after Renford's arrest. *See* Motion to Suppress [ECF No. 9-1] at 13–15. In that motion, Renford's lawyer argued that the State lacked probable cause to arrest him and that any evidence the State gleaned from that improper arrest—including, as relevant here, the photo the State placed in the photo lineup—should be suppressed under the "fruit of the poisonous tree" doctrine. *Id.* at 14. Renford's lawyer described the situation this way:

> [Renford] was observed on [Interstate] 95 by a person. That person called in the fact
> that he saw two people walking on the shoulder of 95. That there was a search for Mr.

Renford and Mr. Humphrey resulting in their arrest a couple hours later. They were charged—they were arrested for dealing in stolen property.

And, again, I suggest to the Court the evidence will show there was absolutely no probable cause to arrest. Immediately upon arrest they are placed in the back of a police car where there is an audio/video camera. I'm seeking to suppress that as fruit of the poisonous tree. Later on in the station after the arrest, after the illegal arrest, Mr. Renford is identified. By then law enforcement up in northern Florida have determined, established, found out that the car that was parked on the highway was part of this armed robbery, armed carjacking, and it's stolen.

They identify Mr. Renford. They send a photo of Mr. Renford—or they send his identity information down here to Detective Hoover in Broward County. He constructs a photo lineup based on that information out of which the victim identifies Mr. Renford as one of the perpetrators. *I'm seeking to suppress the photo ID, again, as the fruit of the poisonous tree because they wouldn't have his identity nor his picture without the arrest.*

Hearing Transcript on Motion to Suppress [ECF No. 10-4] at 9 (emphasis added). After a hearing, the

trial court agreed that the officers lacked probable cause to arrest Renford. *See id.* at 140 ("Therefore,

I do find based upon the lack of basis for the BOLO during the course of the hearing that the Court

must grant the motion to suppress."). It thus granted the defendant's motion and suppressed the

lineup—though not because the lineup was unconstitutionally suggestive. *See id.* at 156 ("The Court:

Well, I'm granting the suppression on [the photo lineup] unless the State can show an independent

basis or source of identity prior to the photo lineup. [Defense Counsel:] Okay. The Court: If the State

can do that, then under those circumstances I would review my ruling.").

One day before the first trial, the prosecutor showed the victim the now-suppressed lineup as

a way of preparing him for trial. *See* First Trial Transcript [ECF No. 10-1] at 56 ("[Defense Counsel:]

Just so that I may have a complete record, could we excuse the jury so I can ask [the victim] outside

the presence of the jury exactly what was done with him in the photo lineup prior to him testifying

here today before I go forward?"); *id.* at 58 ("Q: Okay. And when you met with [the Assistant State

Attorney] she showed you that photo lineup, right? A: Yes."). After hearing the victim's testimony

about the lineup, the trial court reiterated that the lineup was "not admissible in evidence, but . . . that

there is nothing improper in using [the photo lineup] to refresh someone's memory." *Id.* at 63. The

victim, for his part, stated unequivocally that he would have been able to identify Renford as the assailant *even without* the photo lineup. *Id.* at 59–60. When Renford's lawyer moved to preclude the victim from identifying Renford in court, the judge denied the motion. *See* Motion to Exclude In-Court Identification [ECF No. 9-1] at 19–20; Order Denying Motion to Exclude [ECF No 9-1] at 31.

An identification must be suppressed if the "corrupting effect of police-arranged circumstances" render it unreliable. *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012) (cleaned up). In other words, "[a]n identification infected by improper police influence . . . is not automatically excluded." *Id.* Instead, a photo lineup is considered "impermissibly suggestive" if there is "a very substantial likelihood of irreparable misidentification." *United States v. Elliot*, 732 F.3d 1307, 1309 (11th Cir. 2013) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). If a photo array is not improperly suggestive—or if, despite a suggestive lineup, the identification's reliability is "strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances"—the identification "ordinarily will be admitted" and won't offend a defendant's constitutional rights. *Perry*, 565 U.S. at 232.

As with Ground One, Renford advanced this claim on direct appeal, *see* Initial Brief [ECF No. 9-1] at 122 ("The trial court erred when it permitted [the victim] to make an in-court identification of [the Petitioner] which was tainted because the prosecutor showed the witness a photo of [the Petitioner] which had been suppressed"), and the Fourth DCA summarily affirmed the trial court's decision, *see Renford*, 264 So. 3d at 164 (affirming Trial Court's Order Denying Renford's Motion to Exclude [ECF No 9-1] at 31). Again, then, we presume that the Fourth DCA adopted the trial court's reasoning. *See Wilson,* 138 S. Ct. at 1192. Since this claim was "adjudicated on the merits in State court proceedings," we apply § 2254(d)'s heightened standard of review. *See* 28 U.S.C. § 2254(d); *see also DeJesus*, 2022 WL 1262093, at *11.

"When reviewing a state court evidentiary ruling, generally federal courts are not empowered to correct erroneous evidence rulings of state trial courts." *Snowden*, 135 F.3d at 737 (cleaned up). Nevertheless, "when a state trial court's evidence ruling denies a habeas petitioner fundamental constitutional protections, this court's duty requires it to enforce the constitution's guarantees by granting the petition for a writ of habeas corpus. Before relief can be granted the error must rise to the level of a denial of fundamental fairness." *Id.* (cleaned up). "A denial of fundamental fairness occurs whenever the improper evidence is material in the sense of a crucial, critical, highly significant factor." *Id.* (cleaned up).

The state trial court's decision was reasonable. Florida law requires the suppression of an in-court identification only if it relied on an "impermissibly suggestive" photo lineup. *See State v. Sepulvado*, 362 So. 2d 324, 327 (Fla. 2d DCA 1978) ("[I]n-court identification must only be prohibited if the impermissibly suggestive pretrial identification procedure gives rise to a very substantial likelihood of irreparable mistaken identification." (cleaned up)). And the Eleventh Circuit has made clear that the government can refresh a witness's recollection with inadmissible evidence. *United States v. Scott*, 701 F.2d 1340, 1346 (11th Cir. 1983) ("[T]he testimony elicited through refreshing recollection may be proper, even though the document used to refresh the witnesses' memory is inadmissible.").

Our case is even easier than *Scott*, where the jury saw the witness review the inadmissible evidence *in court*. *See id.* ("[T]he Government elicited through certain witnesses' testimony the pertinent information contained in the inadmissible documents."). Here, by contrast, the State only showed the victim the lineup on the day before the trial—and outside the jury's presence. *See generally* First Trial Transcript [ECF No. 10-1] at 60 ("Q: It looked similar. Do you feel confident that without this photo lineup you would still be able to identify Mr. Renford as the person who did it? A: Yes, sir. Q: Without the photo lineup? A: Yes, sir. Q: Okay. So the lineup had nothing to do with [your ability to identify him]? A: No, sir."). Plus, as the state court found—in a determination Renford doesn't challenge

here—there was nothing "unduly suggestive" about the lineup the victim was shown. Again, the lineup was suppressed, not because it was suggestive—it wasn't—but only because it was the fruit of the unlawful arrest. There was thus no reason for the prosecutor to refrain from using it to refresh the victim's recollection. In any event, as we've explained, the victim was adamant that he didn't need the lineup to refresh his recollection and that he would've remembered Renford without it. As a result, even if the lineup had been unduly suggestive, the reliability of the in-court identification would have been "strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances[.]" *Perry*, 565 U.S. at 232. Ground Two, therefore, is likewise **DENIED**.[7]

### EVIDENTIARY HEARING

We won't hold an evidentiary hearing in this case. "[W]hen the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" *Cullen v. Pinholster*, 563 U.S. 170, 183 (2011) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). The claims we resolved under § 2254(d) require no factual development. *See Williams*, 529 U.S. at 444 ("The Court of Appeals rejected this claim on the merits under § 2254(d)(1), so it is unnecessary to reach the question whether § 2254(e)(2) would permit [or restrict] a hearing on the claim."). As for Ground Three, we don't need a hearing because "the record refutes the applicant's factual allegations

---

[7] Even if the prosecutor's use of the lineup had been improper, we'd still have denied Ground Two because Renford has failed to show "actual prejudice." In *Brecht*, as we've explained, the Supreme Court held that a federal habeas court cannot correct a constitutional error unless the petitioner shows that the error caused "actual prejudice"—*i.e.*, that it had a "substantial and injurious effect or influence" on the jury's verdict. 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Renford cannot show "actual prejudice" here. Again, the victim testified—in unrebutted testimony—that he would have been able to identify Renford at trial *even if* he had not been shown the lineup. *See* First Trial Transcript [ECF No. 10-1] at 59–60. There's thus no evidence for Renford's view that the prosecutor's decision to show the victim the lineup had *any* effect—let alone a "substantial and injurious effect or influence"—on the jury's verdict. Put differently, even if there had been error, we "can 'say, with fair assurance,' that the verdict 'was not substantially swayed by the error.'" *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1114 (11th Cir. 2012) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437–38 (1995)).

or otherwise precludes habeas relief[.]" *Schriro*, 550 U.S. at 474.

## CERTIFICATE OF APPEALABILITY

A Certificate of Appealability ("COA") is appropriate only when the movant makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To deserve a COA, therefore, the movant must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "Where a district court has disposed of claims . . . on procedural grounds, a COA will be granted only if the court concludes that 'jurists of reason' would find it debatable both 'whether the petition states a valid claim of the denial of a constitutional right' and 'whether the district court was correct in its procedural ruling.'" *Eagle v. Linahan*, 279 F.3d 926, 935 (11th Cir. 2001) (quoting *Franklin v. Hightower*, 215 F.3d 1196, 1199 (11th Cir. 2000)).

Reasonable jurists wouldn't find our resolution of the Petition's constitutional claims debatable or wrong. Nor would jurists of reason debate the correctness of our procedural rulings. We thus **DENY** any request for a COA.

*** 

After careful review, the Court hereby **ORDERS AND ADJUDGES** that the Petition is **DISMISSED** as to Ground Three and **DENIED** as to Grounds One and Two, that any request for a COA is **DENIED**, that any demand for an evidentiary hearing is **DENIED**, that all deadlines are **TERMINATED**, and that any pending motions are **DENIED** as moot. The Clerk of Court shall **CLOSE** this case.

**DONE AND ORDERED** in the Southern District of Florida, this 7th day of June 2022.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:  Tyshon Renford, *pro se*
     counsel of record